# PROVIDENCE COUNTY.

## UNION SAVINGS BANK vs. HENRY M. TABER.

The following statutory provisions being in force, i. e.,

" Where any person, or persons, or others from whom he or they derive their title, either by themselves, tenants, or lessees, shall have been for the space of twenty years in the uninterrupted, quiet, peaceable, and actual seizin and possession of any lands, tenements, or hereditaments, for and during the said time, claiming the same as his, her, or their proper, sole, and rightful estate in fee simple, such actual seizin and possession shall be allowed to give and make a good and rightful title to such person or persons, their heirs and assigns forever; . . . Nothing in this chapter shall be construed, deemed, or taken to extend to prejudice the rights and claims of persons under age, *non compos mentis, femes covert*, or those imprisoned, or those beyond the limits of the United States; they bringing their suit therefor within the space of ten years next after such impediment is removed, or to bar any person or persons having any estate in reversion or remainder, expectant or depending, in any lands, tenements, or hereditaments, after the end or determination of the estate for years, life or lives; such person or persons pursuing his or their title by due course of law within ten years after his or their right of action shall accrue."

I. J. and A. J. his wife, seized of certain realty in her right, conveyed it to B. by deeds in due form, except an informality which vitiated the wife's acknowledgment. B., on the date of the deeds in 1834, took possession of the realty, and in 1838 conveyed it to M. by warranty deed. M. took possession, and his seizin and that of his grantees has continued to the present time.

A. J. died in 1848, leaving children, one of whom, F., born in 1843, married in 1862, is with her husband still living. I. J. died in 1864.

*Held*, that by the above statutory provisions the title of those claiming under B. was established against all persons claiming under A. J.

*Held*, further, that F., being a minor on the death of A. J., whatever right to the realty F. might have had was barred ten years after her arrival at majority, and that this term of ten years was not prolonged by her marriage while a minor.

*Clarke* v. *Cross*, 2 R. I. 440, commented on and approved.

*Held*, further, that the statute began to run in favor of B. from the time his seizin and possession corresponded with the statutory description, notwithstanding the outstanding curtesy of I. J.

B., in 1835, took possession of certain realty, claiming an absolute ownership, and in 1838 conveyed it by warranty deed to M., whose successors in title have since held it.

When B. took possession the realty belonged to R. and his wife A. in her right, R. having a tenancy by the curtesy initiate. R. died in 1847. A. died in 1844, leaving children, of whom one was the above named B., and another, a daughter T., was born in 1809, married in 1831, and died in 1852, leaving several children and her husband, who are still living.

*Held*, that if B., being before that time a tenant in common of the realty with R. and his wife A., did not in 1835 disseize R. and A., still R. and A. were certainly disseized in 1838 by B.'s conveyance to M., and M.'s entry and possession.

*Held*, further, that owing to this continued disseizin T.'s husband never was entitled to curtesy in the realty.

*Held,* further, that by the above statutory provisions the title of M. and his grantees was established against all persons claiming under R. and his wife A.

The Rhode Island statute of possessions explained.

BILL IN EQUITY for specific performance.    On demurrer to the bill.

The case is fully stated in the opinion of the court.

*James Tillinghast,* in support of the demurrer.

The defendant demurs to the bill, *first,* because the complainant, " as appears by its said bill, has not and cannot make to this defendant a good marketable title to the lands and estate described in its said bill, and in the contract therein referred to ; " *second,* generally, for want of equity.

I. Mr. Jennings, at the date of the deed, September 25, 1834, not only had by marital right a vested estate in possession of these lots for the joint lives of himself and his wife, but having had by his wife a child previously born, had, also, as tenant by the curtesy initiate, a vested indefeasible estate in possession for his own life. *In re the Voting Laws,* 12 R. I. 586, 589.    And this estate passed by his deed to the purchaser, who thus took an indefeasible title in the lots for the life of Mr. Jennings.

It probably will not, or at least cannot successfully be contended, that if Mrs. Jennings herself had lived, and died at the same time as her husband, the adverse possession could have commenced until her death.    Not merely because her coverture would have protected her, but because she could not, during her husband's life, have questioned the possession of the purchaser under him.

Nor can it any more be contended that the possession became adverse to her heirs until her husband's death.

For, as stated in 1 Inst. lib. 1, cap. 4, sec. 35 [a] :

" And albeit the state be not consummate until the death of the wife, yet the state hath such a beginning after issue had in the life of the wife as is respected in the law for divers purposes. . . .

" *Secondly.*   If after issue the husband maketh a feoffment in fee, and the wife dieth, the feoffee shall hold it during the life of the husband, and the heir of the wife shall not during his life recover it in *sur cui in vita ;* for it could not be a forfeiture, for that the estate at the time of the feoffment was an estate of tenancy by the curtesy initiate and not consummate."

Although at common law it would work a discontinuance of her estate and put her or her heirs, after the husband's death, to their action. 2 Inst. lib. 3, ch. ii. sec. 594 [366 a]. But this was remedied by 32 Henry VIII. cap. 28. 3 Blackstone Comment. *172. Compare our statute, Pub. Stat. R. I. cap. 166, § 9, first enacted Digest 1798, p. 267, § 7.

And so long as this estate *pur autre vie* continued, the possession of the purchaser, and of those claiming under him, could no more be adverse to the heirs of the wife than if it had continued in Mr. Jennings himself. The possession of a tenant of a particular estate is never adverse to the tenant in reversion or remainder. Ld. Mansfield in *Fishar & Taylor* v. *Prosser*, Cowp. 218 ; Roscoe on Real Actions, 502–504 ; Stearns on Real Actions, 242.

For parallel cases of conveyances in fee by the husband alone, or as here by deed ineffectual as against the wife, see *Melvin* v. *Proprietors of Locks and Canals*, 16 Pick. 137, 140 ; *Raymond* v. *Holden*, 2 Cush. 264, 269 ; *Mellus* v. *Snowman*, 21 Me. 201 ; *Fagan* v. *Walker*, 5 Ired. 634 ; *Jackson* v. *Cairns*, 20 Johns. Rep. 301 ; *McCorry* v. *King's Heirs*, 3 Humph. 267 ; *Meramon's Heirs* v. *Caldwell's Heirs*, 8 B. Mon. 32 ; *Gill & Simpson* v. *Fauntleroy's Heirs*, 8 B. Mon. 177, 186, 188. See, also, *Doe on dem. Milner* v. *Brightwen*, 10 East, 583 ; *Doe on dem. Colclough* v. *Hulse*, 3 B. & C. 757 ; *Heath* v. *White*, 5 Conn. 228 ; *Foster* v. *Marshall*, 22 N. H. 491 ; *Wells* v. *Prince*, 9 Mass. 508 ; *Wallingford* v. *Hearl*, 15 Mass. 471 ; *Tilson* v. *Thompson*, 10 Pick. 359 ; *Miller and others* v. *Ewing*, 6 Cush. 34.

II. Section 3, as it now stands, of our statute of possessions, Pub. Stat. R. I. cap. 175, does not at all affect this question. It is really as it was first enacted, and as it always appeared prior to the revision of 1857, but a proviso to the original statute, now section 2 ; and the second clause as to reversioners and remaindermen applies only to cases where the tenant of the particular estate has been himself disseized.

An examination of this statute, tracing it back to its origin, it is confidently submitted, conclusively shows this.

The original statute, with its first proviso, was first enacted in 1711. This second clause or second proviso was added to it in

1728.   Judge Brayton, in his opinion in *Clarke* v. *Cross*, 2 R. I. 448, states that the introduction of the English Act, 21 James I. cap. 16, supplied a defect in this statute ; but just when this act, particularly that portion of it affecting lands, came into operation here, seems a matter of much doubt.   The statute of June, 1726, reënacting that portion of it limiting personal actions, seems to negative the idea that it was supposed to have been in force here prior to that time ; and that statute, notwithstanding its somewhat indefinite terms, does not seem capable of a construction which introduces the entire act.   And yet, as appears by the report of the committee upon which the declaratory statute of 1749 was based, it was not understood to be then first introduced, but, as Judge Brayton says, it was "rather at that time recognized as having been in force before."   And the same is true of the Act of 32 Henry VIII. cap. 2, limiting writs of right and other real actions, also named in this same statute of 1749, and again in the revision or recompilation of our colonial laws in 1767.

But whenever and however introduced, the reasoning of Judge Brayton respecting the effect of these English acts upon the first proviso is equally pertinent to the second.   They were introduced with the settled rules and principles of construction and application which prevailed respecting them in the English courts.

The material inquiry for our present purpose therefore now is, what, with these statutes in force, was the state of our law as to reversioners and remaindermen.

*First.*   We may assume, for it will not, or cannot be controverted, that although our statute does not contain the word " adverse," no title could be acquired by possession under it that had not been adverse to the real owner.   As strongly stated by Chief Justice Marshall in *Kirk* v. *Smith*, 9 Wheat. 288, in construing the similar seven years' limitation statute of Pennsylvania : " One of these (rules) which has been recognized in the courts of England, and in all others where the rules established in those courts have been adopted, is, that possession, to give title, must be adversary.   The word is not, indeed, to be found in the statutes, but the plainest dictates of common justice require that it should be implied.   It would shock that sense of right which must be felt

equally by legislators and by judges, if a possession which was permissive and entirely consistent with the title of another should silently bar that title. Several cases have been decided in this court in which the principle seems to have been considered as generally acknowledged. And in the State of Pennsylvania, particularly, it has been expressly recognized. To allow a different construction would be to make the statute of limitations a statute for the encouragement of fraud, a statute to enable one man to steal the title of another by professing to hold under it. No law admits of such a construction."

And Judge Brayton, in *Clarke* v. *Cross, supra,* 2 R. I. 442, recognizes the same principle as applied to our statute.

*Second.* It was well settled, as stated above, that the possession of the particular tenant could not be adverse to the reversioner or remainderman.

There must, too, to bar the right under the English statute of James, have been an actual disseizin, and not one merely by election. 3 Wash. Real Prop. \*488, \*499 ; *Doe on dem. Milner* v. *Brightwen,* 10 East, 583 ; *Hall* v. *Doe on dem. Surtees,* 5 B. & Ald. 687 ; *Doe on dem. Colclough* v. *Hulse,* 3 B. & C. 757 ; *Zeller's Lessee* v. *Eckhert et al.* 4 How. U. S. 289.

And in the case of reversioners and remaindermen it was also well settled under the statute of James, that if the particular tenant was disseized, the tenant in remainder had his election either to consider himself then also disseized or not; and if he did not so elect, his right of entry was not by such disseizin accelerated, but he still might await the regular determination of the particular estate, however long, pending that, such disseizin continued ; and had his full twenty years thereafter in which to assert his title. Angell on Limitations, chap. xxx. and cases in notes ; *Miller and others* v. *Ewing,* 6 Cush. 34.

Now our Statute of 1711 in general terms declared that the mere adverse possession of lands, claiming title, for twenty years should absolutely pass the title, not merely bar the remedy. That is, it not only barred the right of entry, and possessory action resting upon it, under the Act of 21 James I., but any writ of right under the Act of 32 Henry VIII.

It was too sweeping ; and as to reversioners and remaindermen,

in any view, it required amendment. Containing no exception of them, it might on the one hand be held that a disseizin of the particular tenant, continued against him only for twenty years, would absolutely bar the reversioner or remainderman ; and this view of its possible effect seems by the preamble to have actuated this amendment, and seems also to have been Judge Brayton's view of it in his *dicta* to *Clarke* v. *Cross, supra*, 2 R. I. 447.

But it still remains but a proviso to the principal act, and can only apply where there has been an actual disseizin of the particular tenant.

There must still be the full twenty years adverse possession to call the act itself into operation. As Judge Brayton says, 2 R. I. 444, for his statement applies as well to this as to the first proviso then under consideration by him, " The proviso supposes the twenty years have run, and the title is barred by the body of the act." And the only effect of this proviso is to secure to the reversioner and remainderman his full ten years to assert his right " *after his right of action shall accrue*," as the first proviso secures the same time to those under personal disability, no matter how long the disseizin of the predecessor in title may have continued. But if the adverse possession, as here, first commences at the termination of the particular estate, then there is no scope for the proviso at all. The right in remainder has fallen into a right of immediate possession, the twenty years then first begin to run against it, and when it has run its full course, and not till then, the act itself, if no disability exists, not only bars the right but transmits the title.

Further, it is submitted that the heirs of the wife are not reversioners in the sense of this statute, any more than the wife herself would have been had she survived.

III. But another question that the bill presents as to this lot, · and this Jennings one fifth of lot No. 5, is this :

It appears from the bill that Mrs. Jennings left six children. But assuming the possession to have continued as alleged in the bill, all of these seem now to be barred, except Mrs. Freelove, who married May 14, 1862, before the death of her father, as both she and her husband are still living.

*First.* If we are right in the position that the adverse posses-

sion as against these children and heirs of Mrs. Jennings did not commence until the death of their father in 1864, then it necessarily follows that Mrs. Freelove, being then under this disability of coverture, is not yet barred of her claim, and cannot be until ten years after the death of her husband.

*Second.* But if we are wrong in this position, still the question remains whether this disability of Mrs. Freelove does not prevent her title being yet barred.

For if it be held that the possession of Babcock under the deed from Jennings could have been during Jennings' life adverse to the children and heirs of Mrs. Jennings, it was an adverse possession commencing in the life of Mr. Jennings, the father and tenant by the curtesy, and the case is then precisely parallel with *Jackson ex. dem. Beekman* v. *Sellick,* 8 Johns. Rep. 202. See, also, *Jackson ex. dem. Swartwout* v. *Johnson,* 5 Cow. 74; *Stubblefield* v. *Menzies,* U. S. C. C. Oregon, 11 Federal Reporter, 269, 272; *Collins* v. *Riley,* U. S. Sup. Court, Ib. 352.

IV.   As to the other undivided fifth part of lot No. 5, the title of which is now questioned, the Ann R. Babcock fifth. .

It is alleged that in 1829 Mrs. Ann R. Babcock and her husband, Robert S. Babcock, in her right, were seized of this one fifth of this lot No. 5, but no conveyance from them is shown.   It is alleged, however, that October 7, 1835, John W. Babcock " entered into and upon the said last mentioned one undivided fifth part of and in said lot No. 5, with the appurtenances, and became and was seized and possessed thereof; and being so seized and possessed, he, the said John W. Babcock, continued in and had the uninterrupted, quiet, peaceable, and actual seizin and possession of the said last-mentioned one undivided fifth part of and in the said lot No. 5, with the appurtenances, from thence until the making of the said deed to Albert H. Manchester and Ephraim S. Jackson," October 8, 1838, with like allegations in subsequent paragraphs as to the seizin and possession of those holding under him, and conveyances of the whole lot by warranty deed, etc.

*First.*   At the time of this alleged entry upon this fifth, the bill shows that John W. Babcock already held two other undivided fifths of this same lot No. 5, namely, the Jennings fifth, for the

life of Mr. Jennings, under his deed of September 25, 1834, and the Thurston fifth.

He was, therefore, then tenant in common with Mrs. Ann R. Babcock, and there is no averment of any actual ouster or disseizin of her or her heirs, unless the above referred to general averments constitute such.

And the first question therefore presented is, whether these averments necessarily show such actual ouster or disseizin. If they do not, there is nothing in the bill to show that the heirs of Mrs. Babcock are not entitled as tenants in common to-day.

To effect an ouster by one tenant in common of another requires a strong case of actual disseizin brought home to the knowledge of the co-tenant, or so notorious that such knowledge must be inferred. *Holley et ux.* v. *Hawley et al.* 39 Vt. 525; *Phelan & Wife* v. *Kelly,* 25 Wend. 389; *Culver* v. *Rhodes,* 13 Reporter, 405, and cases cited. And cases *supra.*

*Second.* Assuming that the bill does show such actual disseizin of Mrs. Babcock and her husband, the bill further shows that she died May 8, 1844, and her husband January 8, 1847, and from the facts of her family alleged it would seem that all must now be barred, except possibly the children of Mrs. Taylor, who was married October 31, 1831, and who died March 11, 1852, but whose husband is still living; and the question is, can her children be barred till ten years after their father's decease. This question is the same as that in the case of Mrs. Jennings' daughter, Mrs. Freelove, considered above, in that the disseizin had also, as now assumed, commenced in the joint lives of Mrs. Taylor's father and mother, but differs, it may be claimed, from Mrs. Freelove's case in this: that on the assumption here that Mrs. Ann R. Babcock and her husband were both disseized in their joint lives, Mrs. Taylor herself was never seized so as to give her husband curtesy, and that therefore the statute began to run against Mrs. Taylor's children at her death, in 1852. But it is submitted that, even assuming that Mr. and Mrs. Babcock were thus disseized, still upon her decease her title descended to her children, and that Mrs. Taylor thus became seized in law sufficiently to give her husband an estate by the curtesy. 1 Washburn Real Prop. *135, *136, and cases cited; *Jackson ex. dem. Swartwout* v. *Johnson,* 5 Cow. 74.

*James G. Markland & Benjamin N. Lapham, contra.*

*July* 7, 1882. DURFEE C. J. This is a bill for the specific performance of a contract for the sale and purchase of land, brought by the complainant as vendor, against the defendant as purchaser. The land consists of 108 acres in the city of Providence, and includes lots 4 and 5 on the plat of the "Jonas L. Wanton Farm." The bill states the complainant's title in detail. The defendant demurs on the ground that the title to lot 4, and to two undivided fifth parts of lot 5, is defective. Lot 4 and one undivided fifth of lot 5 formerly belonged to Isaac Jennings and Abby W., his wife, in her right. As to this land the bill alleges that September 25, 1834, said Isaac and Abby, being seized thereof as of fee in her right, and said Isaac being seized thereof for life as tenant by the curtesy initiate, undertook to convey it by two deeds to one John W. Babcock in fee simple. The deeds, which were in form suited to their purpose, were respectively signed, sealed, acknowledged, and delivered by them, and were afterwards, October 28, 1834, recorded. The deeds, however, it is admitted by the complainant, were ineffectual as against said Abby, because, though she acknowledged each of them to be her free act and deed, the certificates do not show that she declared that she did not then wish to retract them. Accordingly the complainant claims, not under the deeds, but under the statute by possession. The bill alleges that Babcock, on the day of the date of the deeds, entered on the land and became seized and possessed thereof, and continued in the seizin and possession thereof, claiming it in fee simple, until October 8, 1838, when he conveyed it by warranty deed, duly recorded, to Albert H. Manchester and Ephraim S. Jackson in fee, who thereupon entered and became seized and possessed thereof, claiming it in fee simple. The bill alleges a continuation of the possession in them and in others claiming under them, including the complainant, with claim of right in fee simple, down to the present time, stating Babcock's and their seizin, possession, and claim of right in the very terms of the statute of possessions.

The bill alleges that Abby W. Jennings died November 21, 1848, leaving several children, and among them a daughter named Lydia, who was born September 27, 1843, and who married one

John B. Freelove, May 14, 1862, and that she and her husband are both living. The bill alleges that Isaac Jennings lived until March 28, 1864, when he died.

The defendant contends that the statute did not begin to run until the death of Isaac Jennings, and therefore, inasmuch as twenty years have not since elapsed, that the complainant's title is imperfect. He also contends that if the statute did begin to run in the life time of Isaac, it has nevertheless not operated to divest the estate of Mrs. Freelove, because she was when her father died, and still is, under coverture.

The statute of this State is peculiar. It differs essentially from the statute of 21 James I. cap. 16, and the statutes of other States, which operate merely as a limitation on the right of entry or action, in that it transfers the title or estate itself, *proprio vigore*, whenever the conditions under which it takes effect have been completely fulfilled. The case at bar therefore raises two questions, namely : *first*, What are the conditions under which the statute takes effect? and, *second*, have they in the case at bar been fulfilled ?

The conditions under which the statute takes effect are qualified by certain provisos : but the conditions stated independently of the provisos, in the language of the statute, are these, namely : " Where any person or persons, or others from whom he or they derive their title, either by themselves, tenants, or lessees, shall have been for the space of twenty years in the uninterrupted, quiet, peaceable, and actual seizin and possession of any lands, tenements, or hereditaments, for and during the said time, claiming the same as his, her, or their proper, sole, and rightful estate in fee simple, such actual seizin and possession shall be allowed to give and make a good and rightful title to such person or persons, their heirs and assigns forever." [1] The bill alleges that the complainant and its predecessors in possession have literally fulfilled all these conditions, not only for twenty but for more than twice twenty years. It would seem to follow that the complainant has a perfect title unless the operation of the statute has been controlled and held in check by some one or more of the provisos. The defendant, however, controverts this conclusion. He con-

[1] 1 Pub. Stat. R. I. cap. 175, § 2.

tends that the bill, while it alleges the fulfilment of the conditions in general terms, alleges likewise a specific fact which is inconsistent with their fulfilment.    He refers to the fact that John W. Babcock, who was the first in the succession of possessors, accepted from Jennings and wife their joint deeds, which, because they were defectively acknowledged by the wife, conveyed to him only the life estate or curtesy of the husband.    He contends that it must be assumed that Babcock, accepting the deeds, entered under them as tenant and claimant only of the estate which they were competent to convey, namely, an estate for the life of Isaac Jennings; and that both he and his successors in the possession continued to hold under the deeds, as tenants only of such an estate, until the death of said Isaac.    In support of this contention he cites the provision of the statutes to the effect that a deed by a husband and wife shall convey only the husband's estate, if the wife refuses to make the requisite acknowledgment.    Pub. Stat. R. I. cap. 166, § 9.

The defendant's argument does not convince us.    Neither the bill of complaint nor the certificates of acknowledgment show that Mrs. Jennings ever refused to acknowledge her deeds.    On the contrary, the certificates show that she did acknowledge them, though not with the fulness demanded by the statute.    In these circumstances we think it is quite as probable that Babcock, when he entered on the land granted by the deeds, and became seized and possessed thereof, did so, claiming the land, as the deeds purported in their bodies to convey it to him, as his proper, sole, and rightful estate in fee simple, as that he did so claiming title under the deeds only according to their legal effect.    And certainly under a bill which positively asserts that he and his successors became seized and possessed, and continued seized and possessed, claiming the full title, it cannot be assumed on demurrer to the bill, and especially it cannot be assumed in the face of the warranty deed given by Babcock to Manchester and Jackson in 1838, purporting to convey the land to them in fee simple, that the fact was otherwise.

The fact is, the case which the defendant argues is not the case alleged.    He argues the case as if it were the case of a person who had consciously taken from a husband simply a grant of

his estate by curtesy initiate, either because he had taken it by a deed from him alone, or because he had taken it by a deed from him and his wife, which his wife had actually refused to acknowledge, and having so taken, had entered on the granted premises, claiming title in them according to his grant, and who afterwards, seeking to alter his situation, claimed to be the sole and rightful owner in fee simple. The case, if such were the case, would raise the question whether the court would recognize the claim of absolute ownership at all, or would hold the occupant and his successors by estoppel, so long as he or they retained possession during the life of the husband, to the character in which he entered. That question is different from, and perhaps more difficult than, the question which is here. We do not propose to discuss it now, nor to indicate any opinion upon it, further than to remark that, even in such a case, after the giving of a warranty deed of the premises in fee simple by the occupant, and possession taken under it by the grantee thereof, the question would be much modified, if not completely changed.

The defendant, however, contends further, that the statute did not begin to run until after the death of Isaac Jennings, because during his life the possession of the complainant and its predecessors was not adverse. The possession, he argues, was not adverse so long as it was lawful, because so long as it was lawful it could not be interrupted ; and it would be against reason for possession to ripen into title against an owner powerless to resist it. He contends, therefore, that, though it is not expressly declared in the statute that the possession, to begin to run, must be adverse, it is necessarily implied. In support of this view he cites cases decided under the statutes of limitations of other States. These cases hold that the term of limitation does not begin to run against an owner until a right of action accrues to him, and consequently that it does not begin to run against a reversioner or remainder-man until the expiration of the particular estate. The complainant does not question the correctness of this exposition of the statutes of other States, but contends that it has no value as authority for us because our statute is so radically different. The argument is cogent. The General Assembly was free to enact a mere statute of limitations if sat-

isfied with it.  The statute of 21 James I. cap. 16, which is the great prototype of such statutes, preceded our statute of possessions by nearly a century.  The differences between the two statutes were, therefore, undoubtedly not without a design, and not without a design, too, which would be thwarted if the two statutes were assimilated by construction.  Ours was meant to be the more stringent, summary, and absolute in its operation.  The preamble shows it.  According to the preamble, the statute was passed to prevent " great contests in law," which were imminent, because " at the first settling of this. State, and for sundry years afterwards, lands were of little or no value, and skilful men in the law were much wanted, whereby many deeds, grants, and conveyances were weakly made.".  It was therefore a prominent purpose to make time the healer of precisely such defects as are the cause of the difficulty here, namely, defects of conveyancing.  It is the duty of the court to promote rather than defeat this purpose.  The statute is neither to be weakened by implication nor attenuated by borrowed glosses.  Its strong and aggressive words are to be as strongly and aggressively interpreted; and, in this view, possession must be taken to be adverse, in the only sense in which it need be adverse under the statute, when it fulfils the express requirements of the statute; for then the possessor holds under a claim of right which is in derogation of all other rights and therefore adverse to them.  He holds and asserts his possession against the world.  The question, then, in a controversy like this, is not so much when did the right of action first accrue, as when did the party in possession begin to claim to be the sole and rightful owner in fee simple, making his claim in such manner as to carry a knowledge of it, either actually or presumably, home to the mind of the true owners; for the latter and not the former date is the date at which possession begins to ripen into title; and if it be asked how, if the statute be so construed, a reversioner or remainder-man is protected, the answer is, that he is protected by one of the provisos, by a proviso which, if the construction for which the defendant contends were conceded without limitation, would be utterly meaningless and inexplicable.  Under that proviso the reversioner or remainder-man has ten years, after the particular estate determines, within which

to pursue his title; and therefore under the statute, as qualified by the proviso, the possession, though it begins to run during the particular estate, can never run during the particular estate more than half way to its consummation, thus leaving to the reversioner or remainder-man at least ten years, after his right accrues, within which to bring his action.   The General Assembly undoubtedly deemed this a sufficient protection.

The defendant, however, seeing apparently that the construction for which he contends is irreconcilable with the proviso, submits that the proviso is meant to apply only when the claimant, who sets up a possession during the continuance of a particular estate, has either acquired or retained it by a disseizin of the owner of the particular estate, so that the owner could, if he had so chosen, have sued him out in an action of ejectment, the purpose of the proviso in such case being, he contends, to cut down the twenty years, which the reversioner or remainder-man would have had without it, to ten years.   We do not think the statute affords any ground for such a construction.   The proviso was clearly intended not to accelerate, but to retard the operation of the statute.   Its ostensible purpose is to secure to the reversioner or remainder-man what, without it, he might fail of having, namely, ten years, at least, after the expiration of the particular estate, within which to assert his title by action.   History shows that the ostensible purpose was the real one.   The statute was first enacted in 1711, and, as first enacted, was without the proviso.   The proviso was added in 1728 by a separate act with a preamble.   The preamble refers to the statute, and recites that " therein is no provision made for saving the right of persons having any estate in remainder or reversion ; " whereupon, after the words " for amendment whereof for the future," the proviso is enacted.   It is therefore clear that the proviso was intended to be a saving or indulgence to persons having estates in remainder or reversion, not a curtailment of rights which they previously had, and we can see no reason why it should not be construed according to its intent.   Neither do we find in the statute or the proviso any warrant for the defendant's idea that two kinds of possession are recognizable, namely, possession by persons who enter or hold by disseizin of the owner of the par-

ticular estate, and possession by grantees of the particular estate, and that the first kind is within the statute and the proviso, and the second not. On the contrary, we think, as we have more than once said already, that the possession is operative under the statute whenever it fulfils the express requirements of the statute ; though, as a matter of fact, it may be much easier to prove a fulfilment of the requirements, where the possession is of the first kind, than where it is of the second. We also think that the proviso applies in favor of a reversioner or remainder-man whenever the statute applies against him. In the matter here, more than ten years have elapsed since the expiration of the particular estate, and, therefore, our conclusion is that the title is complete, unless the operation of the statute has been prevented by the other proviso to which we have alluded.

The other proviso is the proviso for the protection of persons under disability. It declares that nothing in the statute " shall be so construed, deemed, or taken as to extend to prejudice the rights and claims of persons under age, *non compos mentis, femes covert,* or those imprisoned, or those beyond the limits of the United States, they bringing their suit therefor within the space of ten years next after such impediment is removed." Abby W. Jennings, the owner of the fee, was under coverture when the possession began. If she had lived she would have become discovert in 1864, and her ten years under the proviso would have expired eight years ago. Was her death equivalent in legal effect to a removal of the impediment ? We think the common opinion is that death does remove the impediment and set the statute in full operation. We do not purpose, however, to consider the question here, for in our opinion it may be eliminated, and the case decided independently of it. Mrs. Jennings died in 1848, and it is not claimed that any of her heirs at law are within the saving of the proviso, unless it be Mrs. Freelove. She came of age in 1864. It follows that more than thirty years have elapsed since she succeeded to her title, and more than ten, nearly eighteen, since the impediment of infancy was removed. The possession, therefore, if it be carried back no farther than the death of her mother, has ripened into title against her, unless she is protected, beyond her infancy, by the proviso. She married when under age, in the life-

time of her father, and, therefore, during the continuance of the particular estate. She has ever since been covert. The question is : Is she within the saving of the proviso ? If she is not, the complainant's title is complete.

In *Clarke* v. *Cross*, 2 R. I. 440, decided in 1853, this court held, Judge Brayton delivering the opinion, that the ten years of the proviso begin to run on the cessation of the disability which exists when the possession begins to run, and that it is not possible for the owner, by adding or incurring further disability, to gain further time. The case is of great authority, not only on account of the profound knowledge which Judge Brayton is reputed to have had of the statute law of the state, but also because, in deciding it, he had the assistance of Chief Justice Greene, who was very familiar with the current opinions and traditions of the bar ; and, in a matter of this kind, such opinions and traditions, which are likely to be based on unreported decision as well as on the practice of the profession, are entitled to a good deal of consideration. In *Clarke* v. *Cross* there was, when the possession began to run, no particular estate intervening between the owners of the fee and the occupant ; but otherwise the case is not distinguishable from the case at bar, and therefore, unless the distinction noted be material, it is a complete and controlling precedent for the case at bar in favor of the complainant. We think the distinction noted is not material. The intervention of a particular estate does not absolutely prevent the running of the statute against the owner of the fee, but at the most only retards it, and therefore we see no reason why, because of it, the proviso should be held to cover a succession of disabilities, when, without it, it would cover only the first. There is no language in either proviso which is suggestive of any such duplex action. In *Clarke* v. *Cross*, Judge Brayton, in his exposition of the two provisos, remarks of reversioners and remainder-men, that " they are not saved by any impediment of the first proviso, but by the existence of the particular estate only, and ten years may count against them, when they might not only be excused from suing, but in which they could not sue." The language is not entirely lucid, but we understand it to signify, not that the first proviso is inapplicable where there is a particular estate, but only that it does not, merely because such an estate intervenes,

afford, in case of successive disabilities, a more extended protection, or, in other words, that the opinion expressed by Judge Brayton is coincident with our own. Our conclusion therefore is, that the complainant's title to lot No. 4 and to said undivided fifth of lot No. 5, as alleged in the bill, is complete under the statute.

We come now to the question raised in regard to the other undivided fifth of lot No. 5. The bill shows, in regard to this, that possession was taken by John W. Babcock in 1835, and that he held possession of it, with possession of the other fifth, until October 8, 1838, when he conveyed it with said other fifth to Manchester and Jackson. The bill then alleges in Manchester and Jackson and their successors, down to the present time, possession, with claim of right, in the terms of the statute, the same as it alleges possession of the other fifth and of lot No. 4. When said John W. Babcock first got possession, the said fifth belonged in fee to Robert S. Babcock and Ann R. his wife, in her right, and also to Robert S. Babcock, as tenant by the curtesy initiate. Ann R. died in 1844, and Robert S. in 1847. Ann R. left at her decease, among other heirs, the said John W., who was her eldest son, and a daughter, named Abby R., born in 1809, and married in 1831 to one William Taylor. Mrs. Taylor died March 11, 1852, leaving several children, and her husband, who is still living.

The first objection which the defendant makes to this title is, that the bill shows that previous to 1835 John W. Babcock was one of the tenants in common of lot No. 5, with Robert S. Babcock and his wife, and that it does not allege any actual ouster or disseizin of said Robert S. and wife by said John W., unless the averment of possession, with claim of right, in and by said John W., couched in the language of the statute, is equivalent to such an allegation. We think the averment is equivalent to such an allegation. There was no grant here, as there was in the matter of the other possession, under which the occupant could shelter himself from suit. The possession was coupled with a claim of absolute ownership. It is this claim, which, to constitute a claim under the statute, must either have been communicated to the co-tenant, or must have been so overt or notorious that the co-tenant may be presumed to have known of it, which gives the possession

its adversary character.　*Warfield* v. *Lindell*, 30 Mo. 272, 282 ; *Law* v. *Patterson*, 1 W. & Serg. 184 ; *Lapeyre* v. *Paul*, 47 Mo. 586, 590.　But if the averment in regard to the nature of the possession previous to 1838 be open to doubt, any such doubt must, we think, be regarded as completely removed by the averment that John W. Babcock conveyed said fifth, October 8, 1838, by his warranty deed, recorded October 11, 1838, to Manchester and Jackson in fee simple, and that Manchester and Jackson thereupon entered upon and became seized and possessed of said fifth, claiming to own it in fee simple.　" When one tenant in common conveys the whole estate in fee," said Chief Justice Shaw, in *Kittredge* v. *Locks and Canals*, &c. 17 Pick. 246, " with covenants of seizin and warranty, and his grantee enters, and claims and holds exclusive possession, the entry and holding must be deemed adverse to the title and possession of the co-tenant, and amount to a disseizin."　See, also, *Parker* v. *Proprietors of the Locks and Canals on Merrimac River*, 3 Met. 91, 100.

The defendant admits that, if there was an actual disseizin of Mrs. Babcock and her husband, the titles of all her heirs at law are, according to the allegations of the bill, extinguished by the statute, unless possibly the titles of Mrs. Taylor's children are saved under the second proviso by the continuing survivorship of their father, and because he has an estate for life in a portion of said one fifth as tenant by the curtesy.　If, therefore, he has no curtesy, and can never have had any, there is no saving of the titles of his children, and the title of the complainant is complete under the statute, even on the defendant's own grounds, without regard to any other.　We think Mr. Taylor was never entitled to curtesy.　His wife was never seized of the estate, either in law or fact.　It was always held adversely to her, the adverse tenure having begun by a disseizin of her ancestors.　The seizin of the wife, or of the husband in her right, during coverture, is, generally, a prerequisite to the acquisition of an estate by curtesy, and, under the strict rule of the common law, the seizin, in respect to corporeal hereditaments, was required to be a seizin in fact.　1 Greenleaf's Cruise, *140.　The strictness of this rule has, however, been relaxed both in England and in the United States; and now, in this country, at least, an immediate right of entry, or

a potential or constructive seizin, where there is no adverse possession, is all that is considered requisite to vest the title of the husband. 1 Greenleaf's Cruise, *140, note. But even with this relaxation of the rule, Mr. Taylor has no estate by curtesy; for, as previously stated, his wife, or her parents, had been disseized before the marriage, and the premises were held in adverse possession during the entire period of the coverture. 1 Washburn on Real Property, *135, *136. In such circumstances the wife had neither actual nor constructive or potential seizin. *Den on dem. Hopper* v. *Demarest*, 1 N. J. Law, 525, 542. Nor does there seem to be any reason why the husband should have curtesy under such circumstances; for if he is too negligent, or too disregardful of his wife's interest, to recover her estate for her during her life, it is no more than right that he should be denied the enjoyment of it after her death. *Demurrer overruled.*